**SO ORDERED.**

**SIGNED this 15 day of January, 2010.**

_____
**Randy D. Doub**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
FAYETTEVILLE DIVISION

IN RE:

TOMMY F. BRIXEY

DEBTOR

CHAPTER 12

CASE NO. 09-05716-8-SWH

**ORDER DENYING CONFIRMATION OF**
**CHAPTER 12 PLAN OF REORGANIZATION**

Pending before the Court is confirmation of the Chapter 12 Plan (the "First Plan") proposed by Tommy Brixey (the "Debtor") on October 7, 2009. Several objections were filed. The only remaining objection for hearing was filed on October 21, 2009 ("CPS Objection) by Crop Production Services, Inc. f/k/a Royster-Clark, Inc. ("CPS"). The CPS Objection requests a hearing in connection with the Debtor's Plan. On November 17, 2009, the Court conducted a hearing to consider the Plan and any objections thereto.

As a result of lingering questions after the hearing, on November 23, 2009, the Court entered an Order requesting the Debtor to file a restated Chapter 12 Plan of Reorganization incorporating the proposed changes recited on the record at the November 17, 2009 hearing (the "Restated Plan," referred to herein with the First Plan as the "Plan"). The Order also required the Debtor to submit an affidavit addressing the basis of the proposed family living allowance; an accounting of the

$25,000.00 in crop proceeds received within a few weeks of the petition date; a summary of the payments made to James Brixey for the period within one year prior to the petition date; an accounting of any amounts owed to the Debtor by his sons; and an explanation as to why the Debtor valued the 50 acres of tobacco crop, 200 acres of wheat crop, and 1,000 acres of bean crop listed on Schedule B at zero dollars. In addition, the affidavit was to address whether or not Case New Holland Credit executed a release with respect to certain collateral that was sold prior to the confirmation hearing.

The Court also requested the parties to submit memoranda addressing the interpretation of good faith under Section 1225(a)(3) of the Bankruptcy Code and the necessity or requirements of perfection, if any, of a security interest in pre-petition crop loans, specifically addressing the transactions between the Debtor and James Brixey, his brother.

On November 30, 2009, the Debtor filed his Restated Chapter 12 Plan of Reorganization (the "Plan") and, on December 18, 2009 filed his Memorandum of Law in Support of Confirmation of Debtor's Proposed Chapter 12 Plan. Attached to the memorandum of law was the affidavit of the Debtor. That same day, CPS filed its Memorandum of Law in Support of Objection to Confirmation of Debtor's Proposed Chapter 12 Plan of Reorganization. Subsequently, on January 4, 2010, the Debtor filed a response to the memorandum filed by CPS.

## DISCUSSION

Section 1225 of the Bankruptcy Code sets forth the requirements for confirmation of a Chapter 12 plan. Subsection 1225(a) details the requirements that every debtor must satisfy.

Subsection (b) applies when an objection to confirmation of the Chapter 12 plan by a holder of an allowed unsecured claim has been filed. The Debtor proposes to make no minimum distribution to unsecured creditors. The Plan provides that disposable income, if any, will be distributed to the unsecured class. Based on the 2010 budget and the liquidation test set forth in the Plan, no payment to unsecured creditors is anticipated. CPS argues that by failing to provide for a distribution to unsecured creditors plus other discrepancies raised by CPS, the Plan fails to satisfy the good faith requirement of subsection (a)(3)[1] and the liquidation test of subsection (a)(4) of Section 1225.

### Plan Fails to Satisfy Best Interest of Creditors/Liquidation Test

Section 1225(a)(4) provides "the value, as of the effective date[2] of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under a chapter 7 of this title on such date[.]"

Based on the liquidation test included as part of the Plan, the Debtor provides that a liquidation would fail to generate any proceeds for distribution to unsecured creditors. The Court points out that the Debtor used improper percentages to calculate the auctioneer's commissions on real property. General Order of Court, dated August 7, 2007, provides that an auctioneer shall receive a ten percent (10%) commission on the first $25,000.00 generated from a sale and a four percent (4%) commission on remaining proceeds from the sale. *See General Order of Court dated*

---

[1] The Court declines to consider whether the Plan satisfies the good faith requirement in 11 U.S.C. § 1225(a)(3) on the basis that other grounds for denial of confirmation exist.

[2] The Plan defines Effective Date as the date on which the order confirming the Plan becomes final and non-appealable.

*August 7, 2007.*[3] The liquidation test in the Plan utilized the commissions allowed to an auctioneer based on the sale of only personal property.

In addition, the liquidation test fails to properly calculate the commission a Chapter 7 trustee might receive. Section 326 provides that a trustee may be allowed reasonable compensation for trustee services, including five percent (5%) of any amounts disbursed in excess of $50,000.00 but less than $1 million. The scale used by the Debtor was inaccurate.

The liquidation test set forth in the Plan also computes a trustee commission on real property and personal property of the Debtor. Some of the properties have little or no equity. Such property with little or no equity would most likely not be liquidated by a Chapter 7 trustee, and therefore, the value of these properties and the computing of commissions to liquidate them should not be included in the liquidation test calculation. The Debtor should calculate a Chapter 7 trustee commission only on those properties that are likely to be liquidated by a Chapter 7 trustee.

The only evidence before the Court is the liquidation test that was included as an exhibit to the First Plan. As addressed above, that exhibit contains several inaccuracies. As such, the Debtor has failed to satisfy the requirements of Section 1225(a)(4) since the Debtor has failed to use the correct trustee and auctioneer commission schedules and compute the liquidation test considering which properties a Chapter 7 trustee would likely liquidate for the benefit of unsecured creditors.

---

[3]The General Order provides that an auctioneer's commission is twenty percent (20%) of the first $20,000.00; ten percent (10%) of the next $50,000.00; and four percent (4%) on the balance in connection with the sale of personal property. With respect to real property, the auctioneer's commission is ten percent (10%) on the first $25,000.000 and four percent (4%) of the balance.

4

The Court also questions the $25,000.00 line item for administrative costs. The Court assumes this amount is for Debtor's attorney fees and the Chapter 12 trustee commission. Although the $25,000.00 may represent an amount the Debtor intends to be paid through the Plan, the amount seems excessively high. This figure should be an estimated figure of administration expenses as of the effective date of the Plan. To date, counsel for the Debtor has not filed a fee application. The Statement of Affairs filed by the Debtor shows that counsel received $5,000.00 on March 9, 2009 and an additional $5,273.00 on April 9, 2009; $273.00 of this amount was for the filing fee expense and the credit counseling fee. Furthermore, the Application for Employment of Professional Person filed by David F. Mills reveals that at the time of the filing, Mr. Mills had applied $4,013.55 to attorney fees and was holding an additional $5,986.45 in trust for the Debtor.[4] Consequently, when this amount is combined with the additional $25,000.00 shown on the liquidation test, the Debtor is calculating more than $30,900.00 in administrative costs should this case be subject to liquidation on the effective date of the Plan as required by Section 1225(a)(4).

The Court finds this estimated administrative cost excessive. This case was filed in July 2009 and the Plan was timely filed within ninety (90) days of the petition date. As of the confirmation hearing, approximately four (4) months had passed and the docket activity is minimal. The Court recognizes Mr. Mills' effort to resolve the objection to the Plan filed by Deere & Company and negotiate a resolution with Cape Fear Farm Credit ("CFFC"). Mr. Mills hourly rate is $195.00 and his paralegal is billed at $97.50 an hour. There are 29 claims docketed, including one by Robeson County, three by CFFC, three by Deere & Company, and six by AGCO Finance, LLC.

---

[4]The $5,986.45 was not included as an asset in the Debtor's liquidation analysis.

Each of the enumerated claims have been addressed by the Plan. The remaining claims are unsecured. Neither claim objections nor adversary proceedings have been filed in this case. Based on the experience of this Court and the pleadings themselves, it does not appear that the matters in this case have been litigious enough to generate such a high administrative expense.

With respect to the commissions due to the Chapter 12 trustee, pursuant to 11 U.S.C. § 326(b), the commission due to the Chapter 12 trustee is not to exceed more than five percent (5%) of all payments under the plan[5] and **is payable after the trustee renders such service**. 11 U.S.C. § 326(b). Therefore, in order for the Chapter 12 trustee's fee to be included as an administrative cost, he must make plan distributions. In this case, the Plan has not been confirmed and there is no evidence before the Court that the Chapter 12 trustee has made any distributions on account of this Debtor, regardless of whether they were under the Plan or not. If no distributions have been made, the administrative expense for the Chapter 12 trustee at the time of confirmation and the effective date of the Plan would be zero.[6] Again, at this early stage in the case, that amount combined with reasonable attorneys fees surely would not amount to $30,986.45.

---

[5]Section 586(e)(1)(B)(ii) of Title 28 of the United States Code places additional compensation limits on a Chapter 12 trustee in that his total percentage fee shall not exceed ten percent (10%) of the payments made under a plan if plan payments aggregate less than $450,000.00. Read in conjunction with Section 326(b) of the Bankruptcy Code, a Chapter 12 trustee is entitled to up to a five percent (5%) commission on expenses and up to a five percent (5%) commission on distributions.

[6]Under the Plan, two claims are due before November 2010. CFFC's Class 3.01 claim requires an interest only payment of $2,347.91 on January 1, 2010 and a $2,589.00 payment on its Class 3.02 claim on November 30, 2009. These two claims may have been paid before the Effective Date, as defined by the Plan. If these payments were made, the Chapter 12 trustee's administrative expense for the liquidation test could be $493.70, based on a ten percent (10%) commission, for the distribution of these funds.

In addition to the large administrative fee used in the Debtor's liquidation test, the Debtor fails to consider recovery of the post petition payment of a pre-petition debt to James Brixey. The Debtor admitted that he repaid his brother, James Brixey, $15,000.00 since the filing of the petition for a loan made to the Debtor prior to the filing of this case. Schedule F listed James Brixey as holding an unsecured claim in the amount of $25,000.00. James Brixey did not file a proof of claim. If the case were liquidated by a Chapter 7 trustee, the trustee is likely to pursue repayment of the unauthorized $15,000.00 post petition transfer. Although a trustee would incur some expenses in pursuing the claim, the Debtor must project a net recovery in calculating the liquidation test.

Based on the unsubstantiated administrative expenses and the failure of the Debtor to include the recovery of the post petition transfer from James Brixey, the liquidation test as proposed is invalid. It fails to take into account an asset of the estate and provide for a reasonable administrative cost expended as of the effective date of the Plan. If those amounts are taken into consideration, there will be some amount that would be available to unsecured creditors for distribution. Therefore, the Plan fails to satisfy Section 1225(a)(4) of the Bankruptcy Code.

### Plan Fails to Provide All Projected Disposable Income Towards Plan Payments

Section 1225 (b)(1)(B) of the Bankruptcy Code provides that if an unsecured creditor objects to the confirmation of a proposed Chapter 12 plan, a court may not approve a plan of reorganization unless the plan provides that all of the debtor's projected disposable be applied to make payments under the plan or under Section 1225(b)(1)(C), the value of the property to be distributed under the plan is not less than the debtor's projected disposable income.

The provisions in Chapter 12 do not define disposable income. However, many of the provisions of Chapter 12 are similar to Chapter 13 provisions. Therefore, the interpretation of

Section 1325 is acceptable when considering confirmation of a plan under Section 1225. *In re Luchenbill*, 112 B.R. 204, 208 (Bankr. E.D. Mich. 1990). Section 1325(b)(2) defines disposable income as current monthly income, less reasonable expenditures for a debtor's support, a debtor's dependent's support, a debtor's domestic support obligation, domestic support obligation, qualifying charitable contributions up to a specified limit and for the continued viability of a debtor's business.

The Plan proposes that the Debtor receive $52,355.00 for his living allowance, which represents the current median income for a family of two in North Carolina. The schedules state that the Debtor is single and does not have any dependents.[7] However, during the confirmation hearing, the Debtor testified that someone resides with him and that she receives some government assistance. There is no contractual or familial relationship between the Debtor and this individual. Based on the evidence before the Court, it does not appear that the Debtor has a legal obligation to support this individual. In his affidavit, the Debtor stated that he receives $100.00 per month from her to assist with the cost of groceries. As a result of this contribution, the requested living allowance is in fact increased by $100.00 per month - $1,200.00 annually.

Furthermore, the Debtor has requested a living allowance but he is not paying his mortgage from that amount. Pursuant to the Plan, CFFC, which holds the deed of trust to his residence, will be paid one (1) monthly payment for all five (5) notes, including the note and deed of trust secured by the Debtor's residence. As such, the monthly payment to CFFC made through the Plan will also cover his mortgage expense. The mortgage expense is one that should be deducted from his living allowance. Had the Debtor had a separate mortgage, those payments would have been deducted from his living allowance, just as a family of two in North Carolina must pay its mortgage/rent from

---

[7] The median income for one (1) wage earner in North Carolina is $38,478.00.

its income. Based on the Internal Revenue Service Local Housing and Utility Standards for Robeson County, North Carolina, the Debtor would be entitled to a $580.00 a month mortgage/rent housing allocation based on a family of two for cases filed in July 2009.[8] Since this amount is being paid through the Plan, the Debtor is required to deduct an annual amount from his living expenses which would make such funds disposable income. As a result, the Debtor's annual living allowance increases by $6,960.00 (12 months times $580.00 a month) since he is not making his mortgage payment directly. If based on the family of two, the live-in roommate should contribute to this expense, such contribution would again increase projected disposable income.

Lastly, pursuant to the Plan, CFFC holds a claim in the amount of $14,646.00. This claim is secured by a 2006 Chevrolet Malibu and a John Deere Model 490 Excavator owned jointly by the Debtor and Scott Brixey. The Debtor intends to surrender the John Deere Model 490 Excavator, which is inoperable. The Plan proposes to pay CFFC the lesser of $11,675.00, which is the value of the automobile, or the amount of the full claim less the proceeds of sale of the excavator. The Debtor does not disclose the monthly payment in the Restated Plan. However, the First Plan states that the annual payment would be approximately $2,589.00 with the first payment being due on November 30, 2009. The First Plan proposed to repay the same amount as the Restated Plan and footnoted that the $11,675.00 claim was based on the value of the collateral retained but that payment may decrease depending on the sale of the excavator.

Schedule B filed by the Debtor lists several vehicles in which the Debtor holds an interest, including a 2007 Toyota Tundra and a 2006 Chevrolet Impala.[9] Schedule B provides that Scott

---

[8] A single person living alone is entitled to a $494.00 a month allocation.

[9] The Court assumes that the 2006 Chevrolet vehicles listed in the Plan and the Schedules are in fact the same vehicle even though the pleadings list two different models - a Malibu and

9

Brixey is the co-owner of the Impala, valued at approximately $13,000.00, and that the vehicle is in his possession. Furthermore, the Debtor states that Scott Brixey "makes payments" on the vehicle. This information is inconsistent with the Plan. If Scott Brixey is in possession of the vehicle and makes the monthly payments directly to CFFC, the Plan should not include payments for this claim. If, however, the Debtor is proposing to make the Plan payments, the Plan should include as additional income amounts received by the Debtor from Scott Brixey as additional income.[10] If the claim is to be paid through the Plan, the $2,589.00 annual payment, or the $215.75 monthly payment, from Scott Brixey to the Debtor in connection with the vehicle are additional disposable income. The receipt of these amounts increase the Debtor's living expenses allowance above that of the median income amount.

When taken together, the annual contribution of $1,320.00 by the Debtor's roommate, the $6,960.00 housing allowance, and the $2,589.00 vehicle payment included in the Plan, increases the Debtor's living allowance by $10,869.00 a year. In order to satisfy Section 1225(b)(1)(B)'s requirement that all disposable income be applied to Plan payments, these funds would have to be paid annually to the Chapter 12 trustee as disposable income. These are monies received by the Debtor above and beyond his living allowance and, therefore, disposable income subject to distribution.

---

an Impala.

[10] If the Debtor is retaining the vehicle and Scott Brixey is no longer operating or paying for it, given that the Debtor has a second, newer vehicle, the Court questions why the vehicle is not being surrendered to eliminate this claim.

10

**Use of Tax Valuations to Establish Value of Real Property**

At the confirmation hearing, CPS questioned the Debtor's use of tax values to support the Debtor's fair market values for his properties. The Debtor fully disclosed on his Schedules and in his Plan that he utilized the Robeson County tax values as the fair market value for each of his properties. On cross-examination, CPS questioned the Debtor about inconsistencies in his valuation of his real property in previous financial statements provided to CPS. However, CPS failed to offer any lay or expert testimony to contradict the valuation of the real properties as of the date of the petition. Because the Debtor "valued assets differently in unrelated pre-bankruptcy Court proceedings or for other pre-bankruptcy purposes need not bind the debtor to the earlier valuations." *In re Schyma,* 68 B.R. 52, 59 (D. Minn. 1985). As such, CPS failed to show that the real property values in the petition were invalid. The Court finds that the Debtor's valuation of the real property as of the petition date using the tax values and for use in the liquidation test, are acceptable, when there was no contradictory valuation evidence other than the values in two year old financial statements.

**Inconsistent Language With Respect to Value of the Assets Securing the Claim of CFFC**

The Plan states "[t]he value of the real estate alone exceeds the amount of the claim [of CFFC]; therefore, the claim is and shall be allowed and treated as fully secured with interest and attorney fees to be included pursuant to the terms of the notes and Section 506(b)." *Restated Chapter 12 Plan of Reorganization, Section 3.01, p. 3.* However, the liquidation test shows that the liens of CFFC exceed the value of the real estate. The Debtor asserts that the claim is fully secured by the value of the real estate so as to justify amortizing the claim of CFFC over a longer period of time. If this is the case, the Debtor should have disclosed this information as opposed to having the

language in the Plan inconsistent with the values of the real property used in the liquidation test. The value of the real estate should not change as between the secured creditor's treatment in the Plan and the proposed treatment of unsecured creditors in the liquidation test.

## CONCLUSION

Therefore, for all the reasons set forth above, confirmation of the Chapter 12 Plan is **DENIED**.

**SO ORDERED**.

## END OF DOCUMENT